Filed 9/22/14  P. v. Leyva CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>RAOUL LEYVA,<br><br>        Defendant and Appellant. | C073522<br><br>(Super. Ct. No. SF120204A) |

On April 22, 2012, defendant Raoul Leyva went to the home of his friend Jamison Smith, knocked on the door, and asked to talk.  Smith, who sold methamphetamine to defendant, recognized his sense of urgency.  Defendant told Smith he had hit his girlfriend, Brandy Arreola, and she was unconscious.

Defendant told Smith he hit Arreola with a two or three punch combination and kicked her.  Realizing what he had done, defendant then tried to revive Arreola. Defendant snapped and attacked Arreola after he found out she cheated on him while he

1

was incarcerated. She had been unconscious for four days by the time defendant called on Smith. Defendant was cleaning her up and keeping her hydrated, but he knew her condition was deteriorating.

Defendant asked Smith to help move Arreola somewhere. Smith said he did not want to get involved and suggested several methods for delivering her to a hospital without implicating defendant. He told defendant several times to take her to a doctor.

The encounter with defendant stayed in Smith's mind for the rest of the night and into the next day. He asked some friends for advice; they told him to do the right thing as Arreola needed his help right now. Defendant returned the following day at 6:30 p.m. and asked Smith to help move Arreola as her condition had worsened. Smith lent defendant a bicycle and they rode to a run-down apartment complex. Upon their arrival, defendant entered an apartment and started attending to Arreola. Smith saw she looked bad, as if she were dead. Arreola had no clothes on, and was covered only with a small sheet or blanket. Defendant told Smith he had run out of Arreola's clothes as she kept soiling herself.

Smith told defendant he knew someone down the street who had a wheelchair they could use to move Arreola. Smith went to a nearby house, where he called 911 on his cell phone. Smith returned and told defendant he called 911. Defendant asked Smith why he did that and complained it would come back to him. He urged Smith to come with him; they rode their bicycles around the corner just as the fire truck and police arrived.

Police arrived at the apartment at 11:02 p.m. on April 23, 2012, finding Arreola lying on her back on the floor. Her arms occasionally twitched and were bent to her chest, with her hands clenched into fists. Arreola's eyes rolled back into her head as she appeared to have convulsions. She had extreme bruising to the face, neck, extremities, and body. Her pupils were uneven and not reactive, her blood pressure was extremely

2

high, her teeth were clenched, and she had decorticate posturing, all signs of neurological problems from trauma.

An emergency room doctor determined the bruising was several days old. Arreola was unresponsive and suffered from severe dehydration. The bruises scattered over her body were healing at different rates, which was indicative of purposeful traumatic injury from an assault. She also had a decubitus ulcer under the sacrum, which was common in someone who had been lying on her back for a long time. Arreola's ulcer indicated she was on the floor for several days. She also sustained fractures to the left and right temporal bones; the injuries were consistent with being kicked. Her bleeding in the brain was so severe it pushed her brain one centimeter to the right. She also sustained significant swelling to the brain, which would usually start one to three days after the injury. The doctor opined that it was possible but highly unlikely that Arreola could walk or talk immediately after sustaining her head injuries.

Arreola was intubated and placed on a ventilator. She had no neurological function for the first six weeks. She eventually came off the ventilator and could move one side of her body. Arreola could eat without assistance from a tube starting in June 2012. She was transferred to a convalescent home, where she stayed with her mother until she went home in August 2012. Her mother taught her to eat and talk, but she did not know her alphabet or colors at the time of the trial.

Testifying in two or three word answers or by nodding or shaking her head, Arreola said she could not walk because something happened to her. She said, "Hit body hard," and struck her chest and legs with her left hand. She also pointed to her neck and said, "neck," when asked what happened. Arreola said it hurt and pointed to her arm. She also indicated that she bled. She got hurt at night when it was dark out, but did not remember where she was or what she was doing when it happened.

Arreola testified that "Raoul" beat her up and said, "He hurt me hard." Raoul used to be her boyfriend and Arreola wanted him to be her boyfriend again. She was not angry

3

with him for hitting her, as it was her fault. She had cheated on him with many men when he was in jail and he heard about it, making him angry, and caused him to grab her neck.

Arreola admitted to testifying at the preliminary hearing that defendant was not the person who hit her. Asked at trial if defendant hurt her, she repeatedly said no. Arreola also testified she did not know who she was waving at when she waved at defendant at trial.

A forensic interviewer with the district attorney's office opined that Arreola communicated at the level of a four-year-old but she probably understood at a higher level.

In a prior uncharged incident, defendant admitted in 2003 to attacking Jennifer Trevino, hitting her on the nose on two occasions, pushing her to the ground, and biting her once on the arm and once on the thigh. Defendant also physically abused Monica Neely, who once lived with him. He punched her, spat on her, and slapped her more times than she could remember. Defendant tried to strangle her more than 20 times. He kicked her hard in the legs and stomach more than once. Defendant's attacks caused Neely to sustain black eyes, marks on her neck and stomach, and bruises all over her back, chest, and legs. When she was pregnant with her second son, defendant broke into her home and kicked her in the stomach because he did not want her to have the baby. The abuse started in 1995 and defendant was first arrested for it in 2003. When they were no longer in a relationship, defendant would brag to Neely about beating other women, including Jennifer Trevino.

An expert testified on domestic violence. Recanting was very common in domestic violence cases. Fear or continuing loyalty to the abuser are reasons for recanting.

Testifying on his own behalf, defendant said he and Arreola's relationship began as best friends and crime partners. They had a romantic relationship for the last two to

4

three months.  They were living with his friend Vicky Dunbar at this time.  Arreola had a habit of disappearing for a few days at a time without warning, and did so around April 16, 2012.  Defendant looked for her, but did not find her until April 19 or 20, when she was on the streets staggering back towards Dunbar's apartment.

Defendant ran to Arreola and hugged her.  She was beat up, with red marks on her face and head, as if someone had punched her.  Arreola was crying and blood leaked from her nose.  She was talking but incoherent, as if she were drunk.  He helped her inside the apartment and said he was going to call the police.  Arreola said, "Nuh-uh," which defendant interpreted as no.  Defendant and Arreola both had outstanding arrest warrants.

Defendant took care of her and slept with her for four or five days.  Starting the second night, defendant periodically woke Arreola up to give her fluids.  He realized she was worsening on April 22.  He decided to have his mother look at her, but first went to see Smith.  He explained what happened to Smith, who told defendant to come back the next day if she did not get better.  Defendant returned the next day when her situation did not improve.  Smith then returned with defendant to the apartment.  Smith told defendant he had called an ambulance and it was on the way.  He left with Smith as defendant knew he would be the leading suspect.

Defendant admitted prior convictions for violating a court order relating to domestic violence in 2003, assaulting Trevino in 2003, giving false information to a police officer in 2008 and 2009, and felony car theft in 2010.

A jury convicted defendant of attempted voluntary manslaughter (Pen. Code, §§ 664, 192, subd. (a))[1] and corporal injury to a cohabitant (§ 273.5, subd. (a)), with enhancements for personally inflicting great bodily injury during domestic violence and

---

[1] Undesignated statutory references are to the Penal Code.

personally inflicting injury causing the victim to become comatose or permanently paralyzed (§ 12022.7, subds. (b), (e)).  The trial court sustained three prior prison term allegations (§ 667.5, subd. (b)).  It imposed the maximum state prison term of 13 years six months, ordered various fines and fees, and awarded 397 days' presentence credits (345 actual and 52 conduct).

Defendant appeals.

We appointed counsel to represent defendant on appeal.  Counsel filed an opening brief that sets forth the facts of the case and requests this court to review the record and determine whether there are any arguable issues on appeal.  (*People v. Wende* (1979) 25 Cal.3d 436.)  Defendant was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief.  More than 30 days elapsed, and we received no communication from defendant.  Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

DISPOSITION

The judgment is affirmed.

      HULL      , J.

We concur:

      RAYE      , P. J.

      DUARTE      , J.